In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-1309

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GLEN MURPHY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04-CR-280—**J.P. Stadtmueller**, *Judge.*

ARGUED SEPTEMBER 20, 2006—DECIDED DECEMBER 8, 2006

Before EASTERBROOK, *Chief Judge*, and POSNER and
EVANS, *Circuit Judges*.

EVANS, *Circuit Judge.* Benjamin Franklin said it in
1789: "In this world, nothing can be said to be certain
except death and taxes." Glen Murphy, a chiropractor from
the posh Waukesha County (Wisconsin) suburb of Elm
Grove, didn't agree with the taxes part of Franklin's
statement. Inappropriately acting on that belief earned
Murphy an indictment for filing false income tax returns
(seven counts) and willfully not filing any at all (three
counts). After being charged, he tried to game the sys-
tem and drag out the proceeding as long as possible. But
in the end, a jury found him guilty on all counts. The
district court (Judge J.P. Stadtmueller) sentenced him to

41 months in prison. Murphy appeals, challenging his convictions on several grounds.

Murphy starts with his primary argument: The district court committed reversible error when it denied him court-appointed counsel. He says the judge improperly forced him to choose between his Fifth and Sixth Amendment rights when he insisted that Murphy demonstrate his financial eligibility for appointed counsel and construed his refusal to do so as a knowing and intelligent waiver of his right to an attorney. Murphy also contends that the judge's instructions to the jury inaccurately stated the law in several respects.

Murphy's problems began after he became a client of an accounting firm calling itself Anderson's Ark & Associates (AAA). AAA, from what we can tell, offered no legitimate services; it instead specialized in international-scale tax fraud. Murphy, himself no fan of taxes, turned to AAA in 1997 in an effort to dramatically lower his past and future income tax liability. AAA obliged, helping Murphy set up a sham, zero-income partnership that took on huge, predetermined losses in sums perfectly tailored to eliminate Murphy's present and past tax liability. AAA also served as a conduit for Murphy to direct money to offshore bank accounts under the guise of advertising expenses. As a grand finale, Murphy did not even file income tax returns from 2001-2003, despite telling his bank that he had done so (and even producing a completed 2001 form) as part of a home refinancing application. In any event, he says he was a victim of AAA, which took him to the cleaners to the tune of $274,000.

The government has been prosecuting AAA, its proprietors, and its clients for several years, and many individual defendants have pled guilty to charges filed against them. But Murphy apparently had his own strategy. During the 10 months leading up to and including his trial,

he employed a pattern of delay and misdirection that would make an NFL offensive coordinator jealous.

Things got started on Pearl Harbor Day in 2004 when Murphy was charged with seven counts of filing false tax returns in violation of 26 U.S.C. § 7206(1). In what was to become a familiar pattern, he made his initial court appearance without counsel but told a magistrate judge he was making efforts to find an attorney. Although without counsel at this event, William Burke, an experienced and savvy attorney from the Federal Defender Service, appeared with Murphy on an "interim" basis as sort of a "friend of the court." The magistrate judge warned Murphy of the dangers of proceeding without counsel and urged him to secure representation as soon as possible. Murphy made no suggestion that he intended to seek court-appointed counsel.

A short time later, Murphy filed a notice seeking to "fire" Burke, who had never been formally appointed to represent him in the first place. On February 10, Murphy reappeared before the magistrate for a hearing regarding the conditions of his pretrial release. He again had no counsel. Once again the magistrate judge implored him to secure representation as soon as possible; once again Murphy promised he was looking for a lawyer and made no mention of getting court-appointed help.

On March 22, Murphy appeared before District Judge Stadtmueller. He had no counsel but entered a rambling, incoherent statement into the record that began:

> Affidavit. Denial that a corporation exists. Equality under the law is paramount and mandatory by law. I, Glen James clan Murphy, a Wisconsin national of the republic of Wisconsin, a titled sovereign, am able to handle and represent me concerning all my affairs. In commerce when being forced to testify all my common law rights are reserved.

The government's attorney, Matthew Jacobs, understandably confused as to whether Murphy's statement indicated his intention to waive counsel, told the court that his own conversations with Murphy and some criminal defense attorneys in Milwaukee indicated to him that Murphy sought to retain an attorney. Judge Stadtmueller gave Murphy yet another warning about proceeding alone and scheduled another appearance for 3 days later, indicating to Murphy that he would be expected to declare once and for all whether he wanted a lawyer. Murphy said nothing about seeking appointed counsel.

Meanwhile the grand jury returned a superseding indictment adding three counts of failure to file tax returns under 26 U.S.C. § 7203, and Murphy's trial, originally scheduled for March 28, was delayed until September. Still, the March 25 continuation hearing went forward. Murphy again appeared alone, and the judge again warned him. Perhaps expecting this to happen, Jacobs apparently took it upon himself to ask Burke to join the proceedings and explore whether Murphy might qualify for court-appointed counsel.

Burke told the court he was willing to meet with Murphy and discuss his financial eligibility. He also suggested that the judge offer to seal any financial information that Murphy would provide, which the judge agreed to do before giving Murphy 3 more days to undertake an accurate accounting of his financial position.

Three days later, on March 28, Murphy finally appeared with counsel: Burke. As Burke explained to the judge:

> The Defendant spent a couple hours in our office going over his financial affairs, and appears at this point— without getting certification from a bank, or getting a formal balance sheet, he appears to easily qualify for our services. His financial situation is, I would say, in a bit of a turmoil at the moment. Now, that

> could turn around, and I am hopeful that it will, but at this point he is eligible by our review so far. I would advise the Court that would be an ongoing review, but in the meantime we will provide representation.

The court approved Burke's appointment as Murphy's counsel and proceeded to set a trial date.

Burke's representation ostensibly lasted for a couple of months, though Murphy continued to submit his own filings to the court. Then, on July 12, Burke filed a motion to withdraw in response to Murphy's belligerent conduct and demands upon Burke to employ frivolous arguments—including a challenge to the constitutionality of the federal tax laws—as a defense. Burke reiterated that he believed Murphy to be eligible for a court-appointed lawyer but expressed some doubt as to whether he was willing to accept an attorney whose fees were to be paid by the government. The judge granted Burke's motion and directed him to see if another federal defender would be willing to accept an appointment as Murphy's counsel.

On July 26, Murphy reappeared before the district court judge for a pretrial hearing. He was without counsel and moved for adjournment of both the pretrial hearing and the upcoming trial, now scheduled for September 6, 2005, until he could retain "effective, competent assistance of counsel." He also denounced Burke and the other lawyers from the Federal Defender Service and expressed an unwillingness to cooperate with them. After promptly denying that motion, Judge Stadtmueller emphatically reiterated to Murphy his need to obtain counsel and ordered him to do so prior to a July 29 hearing. Murphy arrogantly responded, "I am here to challenge your jurisdiction."

Needless to say, when July 29 came, Murphy again appeared without counsel. He asked for more time to

seek representation. The judge denied the motion and expressed frustration that Murphy had not made an effort to secure court-appointed counsel, having declined to provide a Pretrial Services officer with a financial statement under oath that would confirm his eligibility. Murphy responded that he had provided Burke with some information. Ultimately, however, he promised the judge that he would meet with Pretrial Services and provide the necessary financial information, which the judge ordered him to do immediately. Murphy then met with Pretrial Services but declined to provide the information.

On September 1, 5 days before trial, the judge held a hearing to consider another motion by Murphy for an extension of time to secure representation. Murphy claimed he had exerted considerable effort trying to obtain counsel. He also listed the names of several lawyers he had contacted who had declined to represent him. When Jacobs pressed him for further details, Murphy admitted that some of the lawyers he had spoken to considered his case to be outside their area of practice, while others requested too much money. He refused to provide any more specific information, and the judge ultimately determined that the trial would proceed as scheduled.

When September 6 came, Murphy again moved for a stay of the trial. This time he presented copies of correspondence that he had apparently exchanged with various attorneys. In one particularly notable letter, an attorney thanked Murphy for contacting him but explained that he would be unable to provide representation for a fee of $20 as offered by Murphy. The judge denied the motion and the trial went on. After the evidence was submitted, the judge submitted instructions to the jury (more on Murphy's challenges to these later), and Murphy was convicted on all 10 counts. Two weeks later, Murphy

retained paid private counsel, who now represent him on this appeal.

We first address Murphy's argument that the court erred when it insisted that he submit personal financial information in order to secure court-appointed counsel. Because this is a criminal tax prosecution, the argument goes, Murphy was effectively being forced to violate his Fifth Amendment right not to "be compelled in any criminal case to be a witness against himself" if he wanted to exercise his Sixth Amendment right to an attorney by way of court-appointed counsel.

While the Sixth Amendment guarantees that an accused has the right to counsel, and counsel free of charge if indigent, a defendant "may not use this right to play a 'cat and mouse' game with the court, or by ruse or stratagem fraudulently seek to have the trial judge placed in a position where, in moving along the business of the court, the judge appears to be arbitrarily depriving the defendant of counsel." *U.S. ex rel. Davis v. McMann*, 386 F.2d 611, 618-19 (2d Cir. 1967) (citations omitted). As we shall see, a fair reading of this record establishes that that was exactly what Murphy was doing.

A defendant also has the right to conduct his own defense, *Faretta v. California*, 422 U.S. 806, 819-20 (1975), so long as he or she has made a knowing and intelligent waiver of counsel and has been appropriately warned by the court of the dangers of proceeding *pro se*. *United States v. Egwaoje*, 335 F.3d 579, 584-85 (7th Cir. 2003).

The Criminal Justice Act of 1964, 18 U.S.C. § 3006A, governs the process in the event appointment of counsel is necessary. It provides:

> Unless the person waives representation by counsel, the United States magistrate judge or the court, if satisfied after appropriate inquiry that the person is

financially unable to obtain counsel, shall appoint counsel to represent him.

18 U.S.C. § 3006A(b). "The burden of proving inadequate financial means, however, lies with the defendant," *United States v. Sarsoun*, 834 F.2d 1358, 1361 (7th Cir. 1987). "It is not enough to *claim* inability to hire a lawyer . . . ; the statute provides for 'appropriate inquiry' into the veracity of that claim." *United States v. Bauer*, 956 F.2d 693, 694 (7th Cir. 1992) (emphasis in original). The inquiry is usually addressed by having a defendant fill out a form financial affidavit. But the Criminal Justice Act requires "[n]either CJA Form 23 nor any other particular method of ascertaining a defendant's financial status," *Sarsoun*, 834 F.2d at 1361. The exact nature of the appropriate inquiry is therefore left to the judge, and we will not reverse a decision on appointment of counsel adverse to the defendant unless it is clearly erroneous.

It should be immediately clear that Murphy's argument is a loser. He continually refused to file a financial affidavit, although he did manage to convince Burke, the federal defender, of his financial eligibility. But Burke himself admitted that his review of Murphy's financial information was "ongoing" and that Murphy's financial situation was "in a bit of turmoil." Besides, convincing Burke was not the end of the line: The Criminal Justice Act makes eligibility for appointed counsel a judicial determination, not a decision committed to the discretion of the Federal Defender Service.

The truth is that Murphy was wrong to rely on his Fifth Amendment rights (if he even did so—the record suggests that he was hardly diligent in asserting them) by refusing to provide financial information at the court's request because "[u]ntil the government attempts to use the information against the defendant at trial, any encroachment on the fifth amendment protection against self-incrimination is speculative and prospective only."

*Sarsoun*, 834 F.2d at 1364. In fact, Judge Stadtmueller offered to seal any information Murphy provided in order to avoid the risk that it might be used by the government against him. Murphy tells us that the judge should have gone further by offering to receive the financial information *in camera*. But an appropriate inquiry under the Criminal Justice Act does not require "[c]ourts . . . to conduct *ex parte*, *in camera* hearings to determine whether a defendant is eligible for appointed counsel." *Id.* at 1363. The judge offered Murphy a way out, and he did not take it.

Murphy's conduct recalls the situation we considered in *Sarsoun*. *Sarsoun* involved a defendant charged with tax evasion, failure to file income tax returns, and filing a false withholding statement. 834 F.2d at 1359. The defendant repeatedly appeared without counsel and was regularly and urgently warned by the judges of the dangers of proceeding alone. *Id.* at 1359-60. On more than one occasion, when informed of his rights to have appointed counsel, the defendant agreed to fill out a financial affidavit, only to later refuse, reappear without counsel, and demand an appointed lawyer all over again. *Id.* at 1362-63. When the defendant made clear that his refusal stemmed from his Fifth Amendment right not to self-incriminate, the judge assured him that any financial information he provided would not be used against him, and when the judge asked him questions about his income in lieu of the affidavit, Sarsoun refused to answer.

On appeal, we held that where the information available to the trial judge "did not strongly indicate that [the defendant] qualified for appointment of counsel," and the judge "repeatedly urged the defendant to supply sufficient financial information for the court to determine whether he qualified for appointed counsel" and assured the defendant that submitted financial information

would not be used against him, it was not clearly errone-
ous for the judge to determine that the defendant had
impliedly waived his right to counsel based upon the
defendant's "refus[al] to cooperate with the court" with
respect to the submission of financial information.
*Sarsoun*, 834 F.2d at 1361-63.

Murphy's situation is pretty much the same. His failure
to provide financial information despite assurances that
his Fifth Amendment right would be protected left the
court with nothing to conclude that Murphy was a
pauper. Judge Stadtmueller could only rely on Murphy's
status as the sole proprietor of a chiropractic business
and his pre-AAA tax returns to create an inference that
he did not qualify for court-appointed counsel.[1] Murphy
had the opportunity to rebut that inference and establish
insufficient financial means, but he did not do so.

Even when he appeared to signal his readiness, at the
July 29, 2005 hearing, to provide a financial affidavit, he
chose instead to stall for more time by filing repetitive
motions that indicated not that he was seeking more
time to secure financial information, but that he was
contacting private lawyers who either did not have any
experience in cases like his or would not work for a $20
fee.

Murphy says that he could not have waived counsel
because he repeatedly insisted that he intended to retain
someone as his attorney. But a defendant can waive his
right to counsel through conduct as well as words. And
insisting that an attorney raise silly, frivolous defenses is
not a sign that a defendant is acting in good faith. Urging
that a lawyer offer the kind of run-of-the-mill arguments

---

[1] Information not available to the district court at the time, but
highly revealing now, is Murphy's sudden ability to quickly
secure paid private counsel within weeks of his convictions.

offered by tax protesters is strong evidence of conduct which can be viewed as a waiver of Sixth Amendment rights.

All told, Murphy had 9 months from his arraignment until the start of his trial to either secure counsel or demonstrate his financial eligibility for appointed counsel. He did neither. He was just trying to delay things and game the system. Under the circumstances, there is no basis for concluding that Judge Stadtmueller erred by determining that Murphy's right to counsel was impliedly waived.

We next turn to Murphy's problem with the jury instructions. He cites three in particular. First, he argues that they were inaccurate in the way that they conveyed to the jury what it means for a defendant to have acted "willfully" under both 26 U.S.C. § 7203 and 26 U.S.C. § 7206(1). Next, he insists that the court improperly failed to submit to the jury his theory of defense instruction. Finally, he contends that the district court committed reversible error when it mistakenly referred to "evading taxes" (a crime under 26 U.S.C. § 7201 for which he was not charged) in its instruction on good-faith belief as a defense to willfulness.

"We review jury instructions de novo to determine whether they provide fair and accurate summaries of the law." *United States v. Alhalabi*, 443 F.3d 605, 612 (7th Cir. 2006). "In order to receive a new trial based on erroneous instructions, a defendant must show both that the instructions did not adequately state the law and that the error was prejudicial to him because the jury was likely to be confused or misled." *United States v. White*, 443 F.3d 582, 587 (7th Cir. 2006) (citations, alterations, and quotations omitted). We evaluate the correctness of an instruction by considering a judge's charge to the jury as a whole. *United States v. Tingle*, 183 F.3d 719, 729 (7th Cir. 1999).

With respect to Murphy's first argument, "willfully" under § 7206 and its related statutes, including § 7203, means "a voluntary, intentional violation of a known legal duty." *United States v. Pomponio*, 429 U.S. 10, 12 (1976); *see also United States v. Bishop*, 412 U.S. 346, 356 (1973). It "requires proof of a specific intent to do something which the law forbids; more than a showing of careless disregard for the truth is required." *United States v. Hooks*, 848 F.2d 785, 790 (7th Cir. 1988) (quotations omitted).

Judge Stadtmueller instructed the jury separately for each statute. On the § 7206(1) charge for willfully filing false tax returns, the jury was told:

> The word willfully means voluntary and intentionally, with the specific intent to make a statement that the defendant knew was false, when it was the legal duty of the defendant to answer truthfully and the defendant knew it was his legal duty to answer truthfully.

We read this instruction as nothing more than a perfectly accurate—if slightly more verbose—statement of the law as described in *Pomponio* and *Hooks*. We are apparently not alone in this regard: the language is taken verbatim from the § 7206(1) model instruction provided in Judge Leonard Sand's treatise on jury instructions. *See* Leonard B. Sand et al., *Modern Federal Jury Instructions* Inst. 59-24.

The § 7203 willfulness instruction provided:

> The word willfully means the voluntary and intentional violation of a known legal duty or the purposeful omission to do what the law requires. The defendant acted willfully if he was required by law to file an income tax return and intentionally failed to do so.

Murphy objects that the instruction failed to make clear that for him to have acted willfully he must have known that he was required to file a tax return. We fail to see how a jury could not understand from the words "known legal duty" that Murphy was required to know of his legal duty; that is, the duty to file an income tax return. As with the § 7206(1) instruction, the second sentence is merely an effort to more clearly apply the abstract definition of willfulness to the particular conduct that constitutes the crime charged. (This effort also explains the entirely appropriate disparate language of the two instructions, something which Murphy incorrectly interprets as indicating two different definitions of "willfulness.")

We likewise find nothing to support Murphy's second contention: that Judge Stadtmueller improperly refused to submit an instruction on his theory of defense. Not only did Murphy never request any such instruction, he never even offered at trial the theory of defense that he now argues should have been instructed. "[T]he court has no duty to offer an instruction *sua sponte* on behalf of a defendant." *United States v. Hughes*, 213 F.3d 323, 331 (7th Cir. 2000) (quotations omitted).

Murphy's final argument regarding the jury instruction holds a bit more water, thanks to an unfortunate error concerning a defendant's good-faith belief. He argues that the judge committed reversible error by mistakenly referring to the crime of tax evasion, for which Murphy was not charged, in the following jury instruction:

> A defendant does not act willfully if he believes in good faith that he is acting within the law, or that his actions comply with the law. Therefore, if the defendant actually believed that what he was doing was in accord with the tax statutes, he cannot be said to have had the criminal intent to willfully evade taxes. This is so even if the defendant's belief was not objectively

reasonable, as long as he held the belief in good faith. However, you may consider the reasonableness of the defendant's belief together with all the other evidence in the case in determining whether the defendant held the belief in good faith.

The inclusion of "evade taxes" probably occurred from the use of the Seventh Circuit pattern criminal jury instruction for good faith in income tax cases. That model instruction perfectly mirrors this one except that in lieu of "evade taxes" the instruction brackets the three alternative income tax crimes that might be at issue in a given case: "[evade taxes; fail to file tax returns; make a false statement on a tax return]." Pattern Criminal Federal Jury Instructions for the Seventh Circuit 92 (1998).

Despite this mistake, we conclude from our review of the instruction as a whole that the error is not material—that is, the instruction accurately stated the law in a way that would not have created a likelihood of confusion for a reasonable jury.

Even setting aside the fact that the challenged instruction perfectly mimicked our pattern good-faith instruction except for two words intentionally designed to be readily interchangeable, the substantive correctness of the instruction is clear from a comparison of its language with the primary articulation of the legal principle found in *Cheek v. United States*, 498 U.S. 192 (1991):

> In the end, the issue is whether, based on all the evidence, the Government has proved that the defendant was aware of the duty at issue, which cannot be true if the jury credits a good-faith misunderstanding and belief submission, whether or not the claimed belief or misunderstanding is objectively reasonable.

*Id.* at 202.

The three key components of good faith in income taxes cases are clear from each: a defendant's belief must be actual, it need not be reasonable, and it shall be evaluated in conjunction with all of the other evidence. The judge's error, by contrast, was made in what is the least important part of the instruction. The instruction is not about the broader legal definition of tax evasion, failure to file taxes, and filing false tax returns. It is about a defense to the criminal intent of willfulness—an intent that the Supreme Court has already found to require the same showing regardless of whether § 7201, § 7203, or § 7206(1) is the basis of the criminal charge. *United States v. Bishop*, 412 U.S. 346, 356 (1973). The rest of the jury instructions made clear the statutes with which Murphy was charged and the key elements needed to establish their violation. Murphy could not have been prejudiced by this regrettable, but insignificant, slip of the tongue.

For these reasons, the judgment of the district court is AFFIRMED.

A true Copy:

       Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
